IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **CHARLES L. DYAS, JR., et al.,** | ) |
| | ) |
|     **Plaintiffs,** | ) |
| | ) |
| v. | )    **CIVIL ACTION 08-0232-WS-N** |
| | ) |
| **CITY OF FAIRHOPE, etc., et al.,** | ) |
| | ) |
|     **Defendants.** | ) |

**ORDER**

This matter is before the Court on cross-appeals stemming from the Magistrate Judge's order concerning the depositions of several non-party members of the city council ("the Council") and/or zoning and planning commission ("the Commission") of the defendant City of Fairhope ("the City"). (Docs. 89, 92). The parties have filed briefs in support of their respective positions, (Docs. 90, 93, 95, 97),[1] and the appeals are ripe for resolution. After carefully considering the foregoing and other relevant material in the file, the Court concludes that both appeals have merit. This order supersedes the Magistrate Judge's order.

**BACKGROUND**

The amended complaint alleges that the plaintiffs own property ("the Property") within the City of Fairhope ("the City"), which they have tried several times to develop over the years. In 1998, the plaintiffs sued the City and various city officials in connection with these efforts. In 2002, the plaintiffs agreed to dismiss their suit with prejudice after the City agreed to re-zone the Property under a PUD category that would permit construction of a mixed-use neighborhood village center consistent with the City's

---

      [1]Pursuant to Local Rule 72.3(b), the Court has also considered the parties' briefs submitted to the Magistrate Judge. (Docs. 74, 84).

comprehensive plan.  The plaintiffs received the re-zoning in December 2002 and dismissed their lawsuit with prejudice in January 2003.  The Property remained undeveloped thereafter.

In 2006, the Commission and then the Council approved a similar PUD re-zoning designation for an adjacent tract ("the Corte parcel"), in violation of both the City's comprehensive plan (which forbade neighborhood village center PUDs in such close proximity) and assurances by the City and co-defendant Timothy Kant, the City's mayor.  The PUD approved for the Corte parcel ("the Fly Creek Village PUD") was more favorable than that approved for the Property ("the Village North PUD") in several respects, including a single-tenant cap of 54,000 square feet, versus the 18,000 square feet limit applicable to the Property.  The City represented that the 18,000 square feet limit was compelled by its "big box" ordinance.

In early 2007, the plaintiffs were contacted by a major grocery retailer about purchasing the Property.  The retailer required a store of approximately 54,000 square feet.  Kant assured the plaintiffs that he supported their request to amend the Village North PUD to allow a 54,000 square foot building, and he represented that the City would approve the request, since it could not deny the plaintiffs what it had granted the Cortes.  However, in December 2007 the Commission rejected the proposed amendment.  Kant, who sits on the Commission, supported the rejection.

In 2006, the City began considering changes to the traffic flow around the Property, which changes would negatively impact the Village North PUD.  The most important of these changes would be to eliminate northbound traffic on Section Street (on which the village center was to face) or to restrict northbound traffic to a right (south) turn on Highway 98.  The likely result of these changes would be to preclude installation of a traffic light at the corner of Section Street and Highway 98, which light would be important to handle traffic from a developed Property.  Installation of a traffic light at the corner of Parker Road and Highway 98, which would benefit the Corte parcel, would

simultaneously make it unlikely that the Alabama Department of Transportation would approve a light at the corner of Section Street and Highway 98, as development of the Village North PUD would require.  The City's Traffic Committee[2] favored these changes and, in March 2008, the Council approved them.

The plaintiffs noticed depositions for nine non-party members of the Council and Commission, and the defendants and deponents (collectively, "the defendants") responded with a motion to quash, asserting that the depositions were precluded by an absolute testimonial privilege existing as a necessary corollary to the deponents' absolute legislative immunity.  The Magistrate Judge concluded that the deponents could not be deposed "regarding any closed-door discussions and voting relevant to this case" but could be otherwise questioned.  (Doc. 86 at 31-32).

## DISCUSSION

The Magistrate Judge's ruling on a non-dispositive matter must be affirmed unless "it has been shown that the magistrate judge's order is clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *accord* Fed. R. Civ. P. 72(a); Local Rule 72.3(e).  The defendants argue that the Magistrate Judge's order is clearly erroneous to the extent it finds that the Council and/or Commission met and voted in private concerning the matters alleged by the plaintiffs.  The plaintiffs agree that the order is clearly erroneous in this respect.  (Doc. 95 at 1).  Accordingly, the Court **finds** that the Commission and Council did not meet or vote in private or in closed-door session with respect to any matter relevant to this lawsuit.

The plaintiffs argue the order is contrary to law to the extent it finds the privilege applicable at all.  The defendants argue the order is contrary to law in that it does not

---

[2]According to the defendants, the Traffic Committee (which the defendants denote as the Streets Committee), is a committee of the Council, on which various Council members serve.  (Doc. 90 at 4).  The plaintiffs do not contest this description.

adequately limit the scope of permissible inquiry.  The Court considers these issues in turn.

## I.  Decisions to Which the Privilege Applies.

The parties agree that "[l]ocal legislative bodies enjoy absolute immunity when exercising functions in the sphere of legitimate legislative activity." *Macuba v. Deboer*, 193 F.3d 1316, 1320 (11th Cir. 1999) (internal quotes omitted).  The same applies to individual local legislators.  *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).  The plaintiffs do not deny that the Commission and Council are "legislative bodies" and that their members are legislators.  Nor do they deny that the testimonial privilege exists whenever the immunity exists.[3]  Instead, they argue that in making the challenged decisions the Commission and Council were not "exercising functions in the sphere of legitimate legislative activity" but were instead engaged in administrative functions.

"In determining which acts of local legislators are protected by the doctrine of absolute legislative immunity, this Court has drawn the line between legislative actions and administrative actions ...."  *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1392 (11th Cir. 1993).  "A legislative act involves policymaking rather than mere administrative application of existing policies."  *Smith v. Lomax*, 45 F.3d 402, 406 (11th Cir. 1995).  "If the facts utilized in making a decision are specific, rather than general, in nature, then the decision is more likely administrative.  Moreover, if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature."  *Crymes v. DeKalb County*, 923 F.2d 1482, 1485 (11th Cir. 1991).  Whether a decision is legislative or administrative is a "pure question of law."  *Smith*, 45 F.3d at 404 n.7.

---

[3]Some courts have concluded that, even when immunity applies, a balancing of interests is required before deciding whether a testimonial privilege arises.  *See, e.g., Kay v. City of Rancho Palos Verdes*, 2003 WL 25294710 at *13-14 (C.D. Cal. 2003) (collecting cases).  The plaintiffs' silence obviates consideration of this line of authority.

Because "[t]he burden generally rests with the party resisting disclosure to establish the applicability of the privilege," *Sierra Club v. Kempthorne*, 488 F. Supp. 2d 1188, 1191 (S.D. Ala. 2007), it is up to the defendants to show that the deponents were engaged in legislative rather than administrative functions. *Accord Bagley v. Blagojevich*, 2007 WL 43402434 at *4 (C.D. Ill. 2007) ("The party asserting a legislative immunity privilege bears the burden of proving entitlement."); *see also Jaggers v. City of Alexandria*, 2009 WL 2333244 at *4-6 (6th Cir. 2009) (the burden is on the deponents to establish legislative immunity, and a lack of necessary evidence to determine whether conduct was legislative or administrative goes against the deponents).

The plaintiffs identify the deponents' objectionable decisions as involving: (1) approval of the Fly Creek Village PUD; (2) approval of a 54,000 square foot cap for the Fly Creek Village PUD; (3) rejection of an amendment to the Village North PUD to increase its cap from 18,000 square feet to 54,000 square feet; and (4) approval of alterations to traffic flow around and affecting the Property. (Doc. 84 at 4-5; Doc. 92 at 1). The Magistrate Judge ruled that each of these decisions was legislative. (Doc. 86 at 27-30).

As the amended complaint itself states, (Doc. 47, ¶ 20), the re-zoning of the Corte parcel from B-2 commercial to a PUD designation was a zoning decision. "Under both federal and Florida law, zoning and land-use decision-making ... is normally characterized as a legislative function." *Baytree Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989) (failure to amend zoning ordinance as to a single parcel was legislative). "We have held that ... even the decision about which zoning classification should be applied to a specific piece of land [is a] legislative actio[n] ...." *Corn*, 997 F.2d at 1392. The Magistrate Judge did not err by describing as legislative the decision to re-zone the Corte parcel to a PUD.

According to the amended complaint, the plaintiffs were advised that the Village North PUD was subject to an 18,000 square foot single-tenant limit due to the City's big

box ordinance. (Doc. 47, ¶ 18). The creation of the ordinance presumably constituted policymaking and thus legislation. However, the decision not to vary from the ordinance with respect to the Property was not the creation of policy but the enforcement of existing policy, and "[a]cts of zoning enforcement rather than rulemaking are not legislative." *Crymes*, 923 F.2d at 1485 (noting that the denial of a development permit or building permit is administrative, not legislative); *accord Corn*, 997 F.2d at 1392 ("This Court has held that a land use decision by local legislators which is an application of policy to a specific party is not protected by legislative immunity.") (internal quotes omitted). The defendants, who have the burden, have identified nothing from which the Court could conclude that the decision not to allow the Village North PUD a tenant larger than 18,000 square feet was anything other than an application of existing policy (the big box ordinance) to the Property. The Magistrate Judge thus erred by describing as legislative the decision not to amend the Village North PUD to allow for a larger single-tenant footprint.

The decision to approve the Fly Creek Village PUD was accompanied by a decision to allow it a single tenant of 54,000 square feet, as requested by the owners. (Doc. 47, ¶¶ 20-22). The defendants appear to argue the latter decision is legislative simply because it coincided with the legislative decision to re-zone the Corte parcel as a PUD. They cite no authority for the proposition that any decision accompanying a legislative decision is itself necessarily legislative. The decision on tenant size appears to be administrative from at least two perspectives.

First, the big box ordinance already represented the City's policy concerning major tenant footprints. The decision as to the Corte parcel thus represents an "application [or misapplication] of policy to a specific party," *Corn*, 997 F.2d at 1392, which is an administrative action. Certainly there is no indication the deponents were replacing the City's existing policy with a new one.

Second, a decision on maximum tenant size for a particular parcel is comparable to

a decision whether to accept a site plan for a particular parcel. In *Corn*, the plaintiff's property was zoned for commercial use, but when he presented a site plan for a 67,000 square foot strip center and a 103,000 square foot mini-warehouse, the city denied approval of the site plan. 997 F.2d at 1371. The Eleventh Circuit held that the decision to reject the site plan was administrative. *Id*. at 1392-93. The defendants have identified no basis for distinguishing the site plan in *Corn* from the big box request here.[4] Accordingly, the Magistrate Judge erred by describing as legislative the decision to allow the Fly Creek Village PUD to have a 54,000 square foot tenant.

In *Crymes*, the Court stated in dicta that a decision to remove a portion of a road from a list of approved truck traffic routes "was probably legislative in nature." 923 F.2d at 1485. This is consistent with the view that "traffic control" represents a "[g]eneral policy reaso[n]" for a zoning change. *2BD Associates Limited Partnership v. County Commissioners*, 896 F. Supp. 528, 533 (D. Md. 1995). The alterations to traffic flow here involve a major road through the City (Section Street), a four-lane federal highway through the City (Highway 98), and a smaller highway through the City (Highway 104), including three intersections with Highway 98 (Parker Road, Section Street, and Highway 104). While there may be traffic decisions so small as to be presumptively administrative in nature, the decisions at issue here are of such a scale that they are presumptively legislative, and the plaintiffs have identified nothing with which to overcome this presumption. The Magistrate Judge did not err in describing the traffic decisions as legislative.

The defendants assert that the mere fact the decisions were embodied in votes

---

[4]The defendants note that in *Bannum, Inc. v. City of Beaumont*, 236 F. Supp. 2d 633 (E.D. Tex. 2002), a decision not to approve a specific use permit for a halfway house for former federal prisoners was deemed legislative. In *Bannum*, however, the complaint itself provided sufficient information about the decision and the community-wide public safety concerns underlying it for the Court to conclude the decision was legislative. *Id*. at 636-37. Here, the defendants have offered no similar information to show that a facially administrative decision should nevertheless be considered legislative.

establishes them as legislative.  (Doc. 74 at 4; Doc. 97 at 3).  This is not the law.  "In *Crymes* ..., we expressly rejected the argument that the act of voting, in itself, constitutes legislative action giving rise to immunity."  *Smith*, 45 F.3d at 406.  The defendants suggest these cases are no longer valid after the *Bogan* Court's pronouncement that the defendant's "acts of voting for an ordinance were, in form, quintessentially legislative."  523 U.S. at 55.  (Doc. 97 at 3).  But the Supreme Court expressly declined to decide whether the mere *form* of legislative action was sufficient, ruling instead that the particular vote was legislative in *substance* because it was a "discretionary, policymaking decision."  523 U.S. at 56.

The defendants also suggest their decisions were legislative because they flowed from a consideration of various concerns.  (Doc. 97 at 7-8).  The defendants identify no such concerns behind the decisions as to square footage, much less any facts of a sufficiently "general" nature to suggest a legislative rather than administrative decision under *Crymes*.  "Administrative" is not synonymous with "mindless" or "ministerial."  It is to be hoped that all governmental decisions are thoughtful, but that does not suffice to make them legislative.

In a related vein, the defendants argue that the decisions were legislative because they were the product of information-gathering and sifting, debate and deliberation — all of which, they assert, are themselves legislative functions.  (Doc. 97 at 7-8).  Again, the defendants identify no such activity specifically with respect to the decisions on square footage and no evidence that such activity occurred.  At any rate, an administrative decision does not become legislative simply because the decisionmakers employ tools typical of the legislative process in reaching the decision.

For their part, the plaintiffs insist the challenged actions were motivated by politics, not policy.  (Doc. 93 at 3-5).  As a threshold matter, the deposition excerpts on which they rely do not support this proposition.  At any rate, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official

performing it." *Bogan*, 523 U.S. at 54.

The plaintiffs also suggest that the Eleventh Circuit has adopted the view of the First Circuit that, if the action "singles out specifiable individuals and affect[s] them differently from others," then the action "is" administrative. *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984). (Doc. 84 at 3; Doc. 93 at 5). The very cases citing *Cutting*, however, state only that a decision impacting specific individuals "rather than the general population" is "more apt" to be administrative, not that a decision affecting some individuals "differently" necessarily "is" administrative. *Smith*, 45 F.3d at 406; *Crymes*, 923 F.2d at 1485. Since "even the decision about which zoning classification should be applied to a specific piece of land [is a] legislative actio[n]," *Corn*, 997 F.2d at 1392, *Cutting* could not represent the law of this Circuit even absent *Smith* and *Cryme*s.

Finally, the plaintiffs argue that the challenged decisions are administrative because they "single out one property owner (the Dyases only)" and because they "affec[t] the Dyases differently from others," especially the owners of the Corte parcel. (Doc. 93 at 5). This argument has no application to the decision to re-zone the Corte parcel as a PUD, since that decision did not single out the plaintiffs but the owners of the Corte parcel. Nor could it prevail against clear Circuit precedent holding that a decision on the zoning classification of any single parcel is legislative. As to the decisions concerning traffic, the argument is both factually and legally incorrect. Factually, the traffic decisions impact countless thousands of motorists, not simply the plaintiffs. Legally, the question is not whether the plaintiffs are affected differently than others but whether they are affected exclusively of others. *Crymes*, 923 F.2d at 1485 ("[I]if the decision impacts specific individuals, rather than the general population, it is more apt to be administrative in nature.").[5]

---

[5]Before the Magistrate Judge, the plaintiffs argued that the defendants have waived any reliance on the privilege. (Doc. 84 at 6-11). The Magistrate Judge rejected this argument. (Doc. 86 at 27 n.4). The plaintiffs did not appeal this ruling, (Doc. 92), so it stands. The privilege has not been waived.

The split nature of the Court's ruling — two decisions legislative and two administrative — is a function of the prevailing burden and the parties' presentations. As noted, the defendants bear the burden of establishing privilege. It may be that, had they offered the Court other evidence and/or argument, the decisions as to square footage could have been shown to be legislative. On the evidence and argument presented, however, that burden has not been met. With respect to the remaining decisions, the Court has been supplied sufficient information concerning them and the law governing them to conclude that they are legislative.

## II.  Scope of the Privilege.

As discussed in Part I, the decisions concerning single-tenant square footage for the two PUDs were administrative. Because those decisions are not protected by privilege, discovery as to them is not limited by privilege. Because inquiry into these decisions is not precluded by privilege, the defendants are not entitled to the order they request prohibiting the depositions from proceeding.

As discussed in Part I, the traffic decisions, and the decision to re-zone the Corte parcel as a PUD, were legislative and so are protected by privilege. The Magistrate Judge ruled that this privilege shielded from deposition only "closed-door discussions and voting" on these matters. (Doc. 86 at 31-32 & n. 9). As noted, there were no "closed-door" discussions or voting. Excising this language, the Magistrate Judge's order extends the privilege only to the actual voting and to discussions preceding the voting by the Council or Commission while in session. The plaintiffs believe this correctly states the scope of the privilege; the defendants argue that the privilege extends much further.

As noted, the plaintiffs do not challenge the proposition that the testimonial privilege exists whenever the immunity exists. "Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Bogan*, 523 U.S. at 54. Thus, as the defendants correctly assert, the deponents cannot be required to respond

to questions implicating *any* "legitimate legislative activity," not simply the legislative activity of meeting as a body to discuss and vote on an issue. *See Cunningham v. Chapel Hill, ISD*, 438 F. Supp. 2d 718, 723 (E.D. Tex. 2006) (the privilege extends to "actions taken in the sphere of legitimate legislative activity").

Legitimate legislative activity includes such things as preparing committee reports and participating in committee investigations, hearings and proceedings. *United States v. Swindall*, 971 F.2d 1531, 1544 (11th Cir. 1992); *Yeldell v. Cooper Green Hospital, Inc.*, 956 F.2d 1056, 1062 (11th Cir. 1992). To the extent the deponents engaged in committee work similar to that described in *Swindall* and *Yeldell*, they were involved in legitimate legislative activity, and both immunity and testimonial privilege attach, precluding examination regarding such activity.

The defendants take this argument a step further, arguing that "any discussions, document review, or information-gathering [the deponents] engaged in related to these issues," as well as "all discussions with City residents, whether privately" or otherwise, constitute legitimate legislative activity and are thus off-limits for questioning. (Doc. 90 at 5, 7). The defendants thereby contend that informal activity by individual legislators in preparation for deciding an issue is a legitimate legislative activity for purposes of immunity and testimonial privilege.

A legitimate legislative activity "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters" within their jurisdiction. *Gravel v. United States*, 408 U.S. 606, 625 (1972); *accord Bryant v. Jones*, 575 F.3d 1281, 1304-05 (11th Cir. 2009). In contrast, "activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself" do not constitute legislative activity. *United States v. Brewster*, 408 U.S. 501, 528 (1972); *see, e.g., Gravel*, 408 U.S. at 625 (efforts to influence the executive branch or administrative agencies concerning the

administration of a statute are not protected).[6]  The defendants have not identified any authority for the proposition that such preliminary and individual activity as reviewing documents, gathering information and communicating with constituents, not performed in the context of a committee or similar setting, constitutes legislative activity for purposes of immunity or privilege under these guidelines.[7]  Because the defendants bear the burden of establishing the applicability of a privilege, the omission is fatal to their argument.

That, however, is not the end of the matter.  The scope of a privilege should be informed by its purpose,[8] and the purposes of legislative immunity and privilege call for a broader privilege than that urged by the plaintiffs.

"Private lawsuits threaten to chill robust representation by encouraging legislators to avoid controversial issues or stances in order to protect themselves."  *Spallone v.*

---

[6] Legislative immunity for Congress stems from the Speech or Debate Clause, while local legislator immunity is a creature of common law.  *Bogan*, 523 U.S. at 49.  The parties do not suggest that the scope of immunity differs between them.

[7] Contrary to the defendants' position, (Doc. 90 at 7; Doc. 97 at 7), the Eleventh Circuit in *Healy v. Town of Pembroke Park*, 831 F.2d 989 (11th Cir. 1987), did not state that private or public discussions with constituents are legitimate legislative activities for purposes of immunity or privilege.  The Court stated only that such comments, reflecting on the legislator's motive, could not be used to show that the legislature's decision was administrative rather than legislative.  *Id.* at 993.  This is a correct statement, *Bogan*, 523 U.S. at 54-55 (motive is irrelevant to the "logically prior question" whether an act was legislative or administrative), but it has nothing to do with whether such discussions are themselves legislative.

[8] *See, e.g.,Nixon v. Fitzgerald*, 457 U.S. 731, 755 (1982) ("In defining the scope of an official's absolute privilege, this Court has recognized that the sphere of protected action must be related closely to the immunity's justifying purposes."); *Roviaro v. United States*, 353 U.S. 53, 60 (1957) ("The scope of the privilege is limited by its underlying purpose."); *In re: Grand Jury Proceedings*, 664 F.2d 423, 429 (5th Cir. 1981) ("The different purposes and social values fostered by the privilege against self-incrimination and the spousal privilege support a distinction in the scope of protection offered each."); *see also Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (the scope of the attorney-client privilege "must be determined in light of its purpose of increasing full and frank communication").

*United States*, 493 U.S. 265, 300 (1990). The purpose of legislative immunity under the Speech or Debate Clause "is to insure that the legislative function may be performed independently without fear of outside interference." *Supreme Court of Virginia v. Consumers Union, Inc*., 446 U.S. 719, 732 (1980). That interference exists not only when legislators are sued, but also when they are called to defend a lawsuit, because this "creates a distraction and forces Members to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 503 (1975). These purposes apply as well to the immunity of local legislators. *Bogan*, 523 U.S. at 53 ("The rationales for according absolute immunity to federal, state, and regional legislators apply with equal force to local legislators.").

The purposes that underlie legislative immunity also apply to the testimonial privilege. *See, e.g., Schlitz v. Commonwealth of Virginia*, 854 F.2d 43, 46 (4th Cir. 1988) ("The purpose of the [legislative immunity] doctrine is to prevent legislators from having to testify regarding matters of legislative conduct, whether or not they are testifying to defend themselves."); *Cunningham*, 438 F. Supp. 2d at 722-23 (to deny a testimonial privilege "would undoubtedly have a chilling effect on local legislative bodies and their members" by "dissuad[ing] some citizens from volunteering for such local legislative bodies" and by "hinder[ing] the free flow of discussion that is such an integral part of the democratic legislative process"); *Miles-Un-Ltd., Inc. v. Town of New Shoreham*, 917 F. Supp. 91, 98 (D.N.H. 1996) (the rationale for the privilege is as "compelling" as the rationale for the immunity, and both "protect the integrity of the legislative process by insuring the independence of individual legislators") (internal quotes omitted).

Interference with an independent legislative branch — whether by dissuading citizens from becoming legislators, discouraging legislators from examining controversial issues, restricting the free flow of information and discussion concerning the issues, or channeling time, energy and resources away from legislative tasks — does not occur only when a legislator is questioned about his or her vote or discussions of the issue while the

body is in session.

For example, "it simply is not consonant with our scheme of government for a court to inquire into the motives of legislators," *Bogan*, 523 U.S. at 55 (internal quotes omitted), and the plaintiffs concede they cannot question the deponents about their motives in voting. (Doc. 95 at 2). Nevertheless, they insist on examining the deponents concerning, inter alia: the historical background of past official actions; the sequence of events leading up to the challenged decisions; departures from normal procedural sequences; substantive factors usually considered important in such decisions; and the legislative history of the decisions. (*Id*. at 3). These lines of questioning, by the plaintiffs' own admission, are for the purpose of proving the deponents' intent. (*Id*.). It is difficult to see how a legislator's independence is threatened when he is asked directly to state his motive in voting a certain way but is not threatened when he is asked a myriad of questions in an effort to prove his motive indirectly. Certainly the distraction from legislative duties is greater in the latter situation, for there is no end to the questions that conceivably could be asked.

The same would be true for questions of a legislator concerning the sources of his or her information, which includes all the categories identified by the defendants. A privilege that prohibits a plaintiff from asking a legislator what was said in the decisive meeting but allows questions concerning any potential influences on his or her decision — such as conversations with constituents, review of documents and other information-gathering, as well as potential bias — offers a legislator no protection worth having. Independence is equally threatened by the scrutiny, motives are probed by indirection, and the hassle and distraction are if anything enhanced.

The plaintiffs insist the Supreme Court has validated their demand for such questioning, (Doc. 84 at 12; Doc. 95 at 2-3), but it has done very nearly the opposite. The Court in *Village of Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S. 252 (1977), did identify the lines of inquiry listed above as means of establishing

indirectly that an unlawful discriminatory intent motivated the passage of particular legislation, *id*. at 266-68, but it did not say that a litigant may depose a legislator to obtain this information. On the contrary, the Court made clear that utilizing a legislator to prove intent would rarely if ever be available. Given that "[p]lacing a decisionmaker on the stand is ... usually to be avoided," it is only "[i]n some extraordinary instances [that] the members might be called to the stand at trial to testify concerning the purpose of the official action, [and] even then such testimony frequently will be barred by privilege." *Id*. at 268 & n.18. *Arlington Heights* thus appears to require both extraordinary circumstances and an exception to the privilege in order to question a legislator concerning intent, and the plaintiffs offer neither.[9]

In order for the privilege not to fail of its essential purpose, it must be substantially more expansive than the plaintiffs would have it. In short, the privilege prevents a litigant from deposing an unwilling legislator to probe for evidence with which to support the litigant's challenge to a legislative decision as improperly motivated, procedurally defective or otherwise infirm. Once it is established that the litigant attacks a legislative decision, the privilege applies to questioning seeking to undermine that decision, including questioning concerning acts that are not themselves legislative and thus not independently privileged.

For example, a litigant cannot ask a legislator questions directly or indirectly probing corporate or individual intent (including, without limitation, questions concerning information considered or made known to the deponent or other legislators; questions concerning the *Arlington Heights* considerations or others like them; and questions

---

[9]Contrary to the plaintiffs' suggestion, the *Arlington Heights* Court did not approve, much less require, the pretrial examination of the legislators that occurred in that case. The Court simply stated that, given the degree of that discovery, the trial court did not unduly restrict the plaintiffs' case by precluding them from questioning the legislators at trial about their motivations. 429 U.S. at 270 n.20.

concerning comments made by or to any legislator or group of legislators, before or after enactment). Similarly, a litigant cannot ask a legislator questions directly or indirectly probing the sequence of events leading to the legislative decision (including, without limitation, questions touching on procedure or timing). This list is not exhaustive but merely illustrative.

The plaintiffs argue that other cases have taken a narrower view of the privilege. (Doc. 84 at 11; Doc. 95 at 1-2). The *Miles-Un-Ltd*. Court recognized that the legislators' depositions could proceed with respect to "acts unrelated to the drafting and passage of the ordinance," 917 F. Supp. at 102, but any line of questioning referenced above is not unrelated to the development and passage of the legislative decision. The *Cunningham* Court concluded that legislators could be asked questions "related to comments they might have made to members of the public or the press prior to or after the session in question, even if the comments were related to the session," 438 F. Supp. 2d at 723-24, but it did so based on the unexplained assumption that inquiry into activities relative to the challenged decision is prohibited only to the extent those activities themselves constitute legitimate legislative activity separately subject to the privilege. As discussed above, the Court rejects that premise.

An approach similar to the one taken here appears in *Kay*, which ruled that the legislative privilege extends to the "objective circumstances surrounding the challenged actions, from which intent may be inferred." 2003 WL 25294710 at *11. As the *Kay* Court noted, this conclusion "is supported by [the privilege's] underlying policy goal, namely, protecting legislators from interference with their legislative duties." *Id*. "Requiring testimony about communications that reflect objective facts related to legislation subjects legislators to the same burden and inconvenience as requiring them to testify about subjective motivations .... Creating an 'objective facts' exception to the legislative process privilege thus undermines its central purpose." *Id*. (emphasis omitted). The Court fully agrees with this analysis. *See also MLC Automotive, LLC v. Town of*

*Southern Pines*, 2007 WL 128945 at \*5-6 (M.D.N.C. 2007) (precluding inquiry into related non-legislative matters preceding the challenged legislative decision because otherwise "the testimonial privilege would effectively be eviscerated"); *Orange v. County of Suffolk*, 855 F. Supp. 620, 625 (E.D.N.Y. 1994) ("This Court notes that Legislator Binder's communicative activities, including his acquisition of information for the purpose of his legislative activities, fall within his legislative privilege.").[10]

      The Court need not now more precisely define the parameters of the legislative privilege. First, from the plaintiffs' filings it appears doubtful they are prepared to ask any questions concerning approval of the Fly Creek Village PUD or the traffic changes that would not be captured by the discussion above. Second, all parties are represented by professional counsel who are capable of working out remaining marginal issues. Third, the Magistrate Judge is well equipped to resolve any lingering issues that may crop up during deposition.

## CONCLUSION

      The analysis above, while the fruit of the Court's conscientious effort to address the limited presentation of the parties, should not be understood as a definitive treatment of legislative immunity or the legislative testimonial privilege. Based on the argument

---

[10]One court, recognizing that "one of the purposes of the [legislative immunity] doctrine is to safeguard legislators from being burdened with the demands of discovery," has concluded that "the objective facts which can be used to challenge regulations should, if at all possible, come from sources other than the testimony of legislators." *Knights of Columbus v. Town of Lexington*, 138 F. Supp. 2d 136, 139-40 (D. Mass. 2001). *But see Fields v. Office of Eddie Bernice Johnson*, 459 F.3d 1, 32 (D.C. Cir. 2006) ("Of course, when the [legislative] privilege makes relevant evidence unavailable, the parties will have to present their cases as best they can without the evidence, as would occur in other instances when non-parties possess privileged information."). Because the plaintiffs have not asserted they cannot obtain the objective facts elsewhere and have therefore waived the argument, the Court need not consider whether the privilege could be overborne in such a situation.

and authority presented, the depositions may proceed consistently with this order and not otherwise.

DONE and ORDERED this 24th day of September, 2009.

                                              s/ WILLIAM H. STEELE
                                              UNITED STATES DISTRICT JUDGE