# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **CHARLES L. DYAS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 08-0232-WS-N** |
| | ) | |
| **CITY OF FAIRHOPE, etc., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

This matter is before the Court on the defendants' motion for summary judgment. (Doc. 156). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 157-160, 165-66, 169-70), and the motion is ripe for resolution. After carefully considering the foregoing, the Court concludes that the motion is due to be granted in part and denied in part.[1]

## BACKGROUND

As alleged in the amended complaint, (Doc. 47), the plaintiffs own two parcels of property in Fairhope ("the Triangle" and "the Adjacent Parcel," collectively "the

---

[1] The defendants' request for oral argument, (Doc. 157 at 1), construed as a motion, is **denied**. *See* Local Rule 7.3.

Property").[2]  In 1998, the plaintiffs sued the City of Fairhope ("the City") and various city officials in connection with their efforts to develop the Property ("the Lawsuit").[3]

In early 2001, as the Lawsuit proceeded, the City adopted a comprehensive plan ("the Plan") that envisioned development of several "village centers."  The plaintiffs then filed an application to rezone the Property from residential to a planned unit development ("PUD"), which would enable development as a village center ("Village North").  In November 2001, the City (acting through its city council ("the Council")) enacted an ordinance changing the Property's zoning to a PUD but imposing conditions and restrictions with which the plaintiffs disagreed, including a cap of 100,000 square feet commercial space.  At some point, the parties explored linking approval of an amended PUD application to dismissal of the Lawsuit.  In late 2002, the City enacted a superseding ordinance ("Ordinance 1163") approving a modified version of the application more to the plaintiffs' liking, and the plaintiffs dismissed the Lawsuit.

In late 2006, the City approved a PUD ("Fly Creek Village") proposed by a landowner ("Corte") for a parcel roughly across Highway 98 from the Adjacent Parcel.  Although Fly Creek Village was limited to 108,000 square feet of commercial development, the plaintiffs viewed it as more favorable than Village North in several respects.  For example, Fly Creek Village was permitted a single tenant of 54,000 square feet, while Village North was limited to 18,000 square feet.

---

[2] The Triangle and the Adjacent Parcel are separated by Section Street, which runs from southwest to northeast, where it intersects U.S. Highway 98.  Both parcels are bounded by Highway 98 to the east.  The western boundary of the Adjacent Parcel is Scenic Highway 98, and the southern boundary of the Triangle is Highway 104, which intersects Highway 98 south of Section Street.  The first intersection with Highway 98 north of Section Street is Parker Road.

[3] The amended complaint purports to attach the 1998 complaint as Exhibit A, (Doc. 47 at 3), but there are in fact no exhibits to the amended complaint.  The original complaint likewise purports to attach the 1998 complaint as Exhibit A, (Doc. 2 at 9-10), but Exhibit A is in fact a complaint filed in November 2001.  (*Id*. at 39).  It appears from the Court files that the 1998 case was dismissed in May 2001 on joint motion of the parties, with leave to re-file within six months.  The 2001 suit appears to constitute the refiling of the 1998 suit.

In early 2007, a development group ("Wallace") expressed interest in buying the Property, but only if the single-tenant limit was raised to approximately 54,000 square feet (to accommodate a major grocery retailer interested in opening a store). The plaintiffs and Wallace entered a transaction, and Wallace presented a proposal to amend Ordinance 1163 to raise the permitted single-tenant square footage. In late 2007, the City's planning and zoning commission ("the Commission") voted to recommend that the Council reject the proposal. Defendant Kant, the City's mayor, sits on the Commission. Despite indicating to the plaintiffs that he supported Wallace's proposal, Kant voted against it.

In 2005 or 2006, the City began considering changes to the traffic flow around and between the Triangle and the Adjacent Property, which changes would negatively impact the Village North PUD. These included eliminating northbound traffic on Section Street (on which the village center was required to face) by rerouting it to Highway 104. Bids for this work were opened in February 2008, and the City approved these changes in March 2008. At about the same time, the City approved installation of a traffic light at the intersection of Highway 98 and Parker Road, which would facilitate traffic flow to Fly Creek Village while making it unlikely that the Alabama Department of Transportation ("ALDOT") would approve a similar light at the intersection of Highway 98 and Section Street, which light Ordinance 1163 required in order to handle increased traffic from a developed Property.

The amended complaint asserts the following causes of action against the specified defendant:

- Count One        Breach of contract        City
- Count Two        Equal protection          City
- Count Three      Due process               City
- Count Four       Inverse condemnation      City
- Count Five       Negligence                City
- Count Six        Misrepresentation         Kant

- Count Seven        Conspiracy          Kant

(Doc. 47 at 18-28).

## DISCUSSION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331,1343(a)(3) and 1367(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). "If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made. [citation omitted] If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

[4]

The parties have submitted almost 2,000 pages of exhibits, some of which they have not referenced in their briefs or have referenced only in part.[4] There is no burden on the Court to identify unreferenced evidence supporting a party's position.[5] Accordingly, the Court limits its review to the exhibits, and the specific portions of the exhibits, which the parties have expressly cited.

Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Accordingly, the Court's limits its review to those legal arguments the parties have expressly advanced.

## I. Breach of Contract.

The amended complaint alleges that the plaintiffs and the City entered a contract on or about November 8, 2002. It alleges that the City breached the contract by: (1) approving the Fly Creek Village PUD; and (2) approving modifications to the flow of traffic on streets surrounding the Village North PUD. (Doc. 47 at 18-19). The City argues that the contract did not obligate it not to do such things, so doing them could not breach the contract. (Doc. 157 at 2).

---

[4] By local rule, "[i]f discovery materials are germane to any motion or response, only the relevant portions of the material shall be filed with the motion or response." Local Rule 5.5(c). The same rule applies to depositions. *Id*. Rule 5.5(b). The parties were cautioned in advance to comply with these rules. (Doc. 35 at 5).

[5] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so."); *accord Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir. 1984); *Karlozian v. Clovis Unified School District*, 2001 WL 488880 at *1 (9th Cir. 2001); *see also* Local Rule 7.2.

**A. Fly Creek Village.**

The parties have identified no document dated on or about November 8, 2002, and the only such document of which the Court is aware is the joint motion to dismiss the Lawsuit, which was filed on that date. The contents of that document have not been made known to the Court. It is plain from the record and argument that the parties never reduced their contract to a single, jointly executed document.

The City maintains that the totality of the parties' contract is reflected in a series of letters by counsel, which mention only the City's obligation to increase permissible commercial square footage to 180,000 – an obligation satisfied by the enactment of Ordinance 1163. (Doc. 157 at 16).[6] In July 2002, the City's lawyer wrote the plaintiffs' lawyer that he "would like for you to reconfirm that if such an ordinance [approving the North Village PUD with 180,000 commercial square feet] is adopted, then the lawsuit will be dismissed with prejudice." (E. Dyas Deposition, Exhibit 29). There is no indication in the record that plaintiffs' counsel so confirmed, and the City has not explained how its own lawyer's letter could unilaterally establish the terms of a bilateral contract.

In January 2003, after Ordinance 1163 had been passed and the Lawsuit dismissed, the City's lawyer wrote the plaintiffs' lawyer, stating that "[y]ou agreed that the federal court action would be dismissed with prejudice once the PUD ordinance approving 180,000 commercial square feet was adopted" and asking counsel to execute and return an enclosed stipulation of dismissal. (E. Dyas Deposition, Exhibit 32). Plaintiffs' counsel executed the stipulation and returned it to the City's lawyer for filing, without comment. (*Id*., Exhibit 33). Counsel's conduct makes clear that he understood

---

[6] The City also suggests the plaintiffs have admitted it had no contractual obligations beyond approving an increase in the commercial square footage, (Doc. 157 at 10), but the deposition excerpts on which it relies do not support such a proposition.

[6]

the City had done everything it was required to do prior to the filing of a stipulation of dismissal, but the City has not explained how his execution of the stipulation negates the existence of any additional or continuing terms of the parties' contract.

The City states broadly that parol evidence cannot be used to add to the express terms of a written contract. (Doc. 157 at 16-17). More precisely, "[t]he applicability of the parol evidence rule necessarily rests upon the existence of a valid written instrument that *completely and accurately expresses the obligations assumed by or imposed upon the parties*." *Prince v. Poole*, 935 So. 2d 431, 444 (Ala. 2006) (internal quotes omitted, emphasis in original). How is the Court to decide whether counsel's January 2003 letter completely expresses the parties' agreement? "Normally, the words used by the parties in a written contract determines [sic] whether the parties intended the writing to be their complete agreement." *Id*. A merger clause would do the trick, *id*., but the letter contains none. Without a clear textual signal, which the Court does not detect and the City does not identify, the Court cannot conclude that the letter completely expresses the parties' mutual obligations. Accordingly, the plaintiffs may introduce parol evidence of additional terms in aid of their claim.

The amended complaint alleges that approval of the Fly Creek Village PUD violated the parties' contract because it "permitt[ed] a neighborhood village [center] to be located within the service area of the Village North PUD." (Doc. 47 at 18). The plaintiffs, however, have no evidence that the parties agreed the City would not approve another village center PUD near the Property. They rely on the testimony of plaintiff Eric Dyas ("Eric"), (Doc. 165 at 9), but he testified only that he "understood" the City would not approve another such PUD because the Plan envisioned approximately 1.5 miles between village centers. (E. Dyas Deposition at 138-44).[7] Whether or not Eric's

---

[7] The amended complaint likewise ties the breach of contract to the terms of the Plan. (Doc. 47 at 18).

assumption as to the City's future conduct was reasonable,[8] it constitutes only his unilateral belief, not a bilateral agreement.  The ordinance that the plaintiffs approved and the City adopted does not even mention the Plan, much less obligate the City to follow the Plan's position on service radii.  (Kant Deposition, Exhibit 16).  Eric admits that it "never entered [his] mind" to propose that the contract incorporate a proximity requirement,  (*id*. at 143-44), and there could not have been an acceptance of a proposal never made.[9]

The plaintiffs, in short, have no evidence of an agreement that, in exchange for dismissal of the Lawsuit, the City would not approve another village center close to the Property.  Thus, no such term is part of the parties' contract.  Whether or not approval of the Fly Creek Village PUD violated the Plan, it did not breach the contract.

The plaintiffs now switch gears, arguing that the City agreed to rezone the Property as a PUD "and then undermined that PUD at every subsequent turn," thereby breaching its duty of good faith and fair dealing.  (Doc. 165 at 41).  "This Court has explicitly held that there is no good faith contractual cause of action, [citations omitted]; that means that bad faith is not actionable absent an identifiable breach in the performance of specific terms of the contract."  *Lake Martin/Alabama Power Licensee*

---

[8] According to Dyas, in his experience the City has treated the Plan and its predecessors as "sacrosanct."  (*Id*. at 140).  According to the City, the Plan is not an ordinance and thus is "only a guide," not a binding document.  (Doc. 157 at 7-8, 17).  The Plan says that the City "should not [not "must not" or "shall not"] approve neighborhood centers that are approximately closer than 1½ miles to each other …."  (Quinn Deposition, Vol. I, Exhibit 4 at 26).

[9] The plaintiffs, (Doc. 165 at 5, 40 n.25), note that Kant, as a mayoral candidate, told Eric "that if they presented a plan that met the comprehensive plan, that I would support it."  (Kant Deposition at 123).  This is far too vague a reference to the Plan to suggest that Kant was proposing that the City would contract not to allow another nearby village center.  At any rate, as a non-officeholder, Kant patently had no authority to extend an offer, and there was thus nothing for the plaintiffs to accept.  *See, e.g., Lee v. YES, Inc*., 784 So. 2d 1022, 1027 (Ala. 2000) ("An agent acting with actual or apparent authority" can bind his principal).

*Association, Inc. v. Alabama Power Co.*, 601 So. 2d 942, 945 (Ala. 1992).[10]  Since there is no contract term governing the location of other village centers, the plaintiffs cannot ground their breach of contract claim on an alleged breach of the duty of good faith governing the location of other village centers.

Although the City cited *Lake Martin* in its principal brief, (Doc. 157 at 21), the plaintiffs ignore it.  Instead, they cite *Hilley v. Allstate Insurance Co.*, 562 So. 2d 184 (Ala. 1990), for the proposition that the duty of good faith and fair dealing "provides that neither party will interfere with the rights of the others to receive the benefits of the agreement."  *Id.* at 190.  (Doc. 165 at 41).  Even *Hilley*, however, continued that "[w]e cannot allow the obligation of good faith and fair dealing to supply a term that adds something new or different to the rights and obligations to which the parties have expressly agreed …."  *Id.*  Like *Lake Martin*, *Hilley* thus requires that a claim for breach of the duty of good faith be based on the breach of an actual contract term, a standard the plaintiffs cannot attain.[11]

### B.  Traffic Flow and Signalization.

---

[10] *Accord Hipps v. Lauderdale County Board of Education*, 631 So. 2d 1023, 1026 (Ala. Civ. App. 1993); *Cook v. United Health Care*, 2010 WL 3629766 at *6 (M.D. Ala. 2010); *Parsons & Whittemore Enterprises Corp. v. Cello Energy, LLC*, 613 F. Supp. 2d 1271, 1289-90 (S.D. Ala. 2009).

[11] The plaintiffs complain that the Court relied on *Hilley* in denying the City's motion to dismiss in August 2008.  (Doc. 165 at 41-42).  At that point, however, the Court was required to accept as true the allegation of the complaint – emphasized by the plaintiffs in their opposition brief, (Doc. 22 at 2)) – that the plaintiffs agreed to dismissal of the Lawsuit "based on … assurances from the City, that the Village North PUD would be the only neighborhood village center within the vicinity."  (Doc. 2 at 12).  This allegation suggested that the parties agreed to a proximity restriction, such that the good faith aspect of the contract claim was based on a specific contract term, consistent with *Hilley* and *Lake Martin*.  On motion for summary judgment, in contrast, the Court examines the evidence, not merely the allegations.  As discussed in text, the plaintiffs have no evidence to support their allegation.

The amended complaint alleges that the City breached the contract by approving a traffic signal at Parker Road and Highway 98; deciding not to install a signal at Section Street and Highway 98; deciding not to install a roundabout at Highway 104 and Section Street; and diverting northbound traffic on Section Street to Highway 104. (Doc. 47 at 18-19). To show that the parties' contract included the City's agreement not to adversely affect traffic flow, the plaintiffs assert that, "[w]hen Fairhope approved Ordinance 1163 it incorporated the parties' specific understandings and agreements concerning traffic flow and signalization in and around Village North." (Doc. 165 at 31).[12] The City acknowledges that the ordinance could "impos[e] an obligation to signalize U.S. 98 and Section Street" but insists the ordinance did not in fact do so. (Doc. 169 at 13).

Ordinance 1163 provided that "[t]he development of Village North will be subject to the recommendations of the Traffic Study" conducted in September 2002. (Kant Deposition, Exhibit 16 at B-2). That study stated that, "[w]hether the development [Village North] is built or not, I recommend this signal [at Section Street and Highway 98] be installed soon," and it "conclu[ded]" that "Greeno Road [Highway 98] and Section Street needs a traffic signal." (*Id*., Exhibit 17 at 2, 5). The ordinance provided that "the developer shall not be responsible for constructing or the cost of construction of the proposed light at the intersection of North Section Street and U.S. Highway 98." (*Id*., Exhibit 16 at B-9). The plaintiffs rest their contract claim on these provisions. (Doc. 165 at 31, 40-41).

Since the development is subject to the traffic study's recommendation, and since the traffic study recommends a traffic signal, the provisions may reasonably be read for the proposition that the development requires a traffic signal. Since the developer is not required to pay for the signal, the provisions may reasonably be read for the proposition

---

[12] It is unclear whether the plaintiffs argue that Ordinance 1163 is itself part of the parties' contract or that, though not part of the contract, it accurately reflects the parties' agreement. For present purposes, the distinction appears immaterial.

that the City must pay for the signal if ALDOT does not.  Reasonably implicit in an agreement that a signal is required and that the City will pay for it is an agreement that the City will assist in obtaining the signal or, at least, will not make obtaining a signal unlikely.[13]  Indeed, Kant confirmed in 2008 that Ordinance 1163 "included the commitment that the City would support the future installation of a traffic signal at the intersection of Highway 98 and Veterans Drive [Section Street]."  (Kant Deposition, Exhibit 33).

The City ignores Kant's concession (quoted in the plaintiffs' brief) and offers no alternative construction of the quoted passages in toto.  Instead, it offers a strained construction of one isolated portion of the provisions, asserting that it has no obligations because only the "development" is "subject to" the traffic study.  (Doc. 169 at 8).  Even read in isolation, that clause does not unambiguously relieve the City of any responsibility concerning signalization, since it appears merely to confirm that the development must have the signal recommended by the study, without assigning responsibility.  At any rate, a contract must be construed as a whole, not in isolated parts, *e.g., N & L Enterprises, LLC v. Lioce Properties, LLP*, 2010 WL 1837800 at *6 (Ala. 2010), and the City's clear obligation to pay for the signal (if ALDOT does not) of itself suggests municipal responsibility to assist in, or not to interfere with, obtaining the signal.

The City next argues that these provisions could not have been part of the parties' settlement agreement because the parties did not discuss, and the City gave no assurances about, signalization.  (Doc. 157 at 19; Doc. 169 at 8).[14]  The implicit assumption here is

---

[13] *See Lloyd Noland Foundation, Inc. v. City of Fairfield Healthcare Authority*, 837 So. 2d 253, 267 (Ala. 2002) ("Where a contract fails to specify all the duties and obligations intended to be assumed, the law will imply an agreement to do those things that according to reason and justice the parties should do in order to carry out the purpose for which the contract was made.") (internal quotes omitted).

[14] The plaintiffs' site planner consultant testified that the parties did not discuss traffic flow and that the City gave no assurances about how traffic would flow around the Property. (Continued)

that nothing can be part of a contract that is not expressly negotiated, but it is common experience for contracts to include provisions the parties never discussed. The City's own position is that the plaintiffs agreed that "if you pass *this ordinance*, we will dismiss the lawsuit," it notes that Eric "reviewed and approved [Ordinance 1163] before its adoption," and it identifies the Council's adoption of the ordinance "as proposed and written" as the "subject of the settlement agreement." (Doc. 169 at 10-11 (emphasis added)). Settlement, then, was at least arguably a package deal that included agreement on all terms of a specific ordinance (not just square footage) and, in particular, agreement on the traffic signal provisions discussed above. Whatever arguments to the contrary might exist, the City has not advanced them.

In a related vein, the City states that the purpose of a traffic study is to evaluate the traffic impact of the development. (Doc. 169 at 8). No doubt it is, but the City's conclusion that the study therefore did not impose any obligations on it, (*id.*), does not follow. The recommendations of a traffic study obtained to evaluate traffic impact can certainly be folded into an agreement concerning implementation of those recommendations, as apparently occurred here.

The City notes that only ALDOT can actually approve the installation of traffic signals on Highway 98 and that it was reasonable for the City not to want signals at both Parker Road and Section Street. (Doc. 157 at 19; Doc. 169 at 8). These circumstances may suggest the City should not have agreed with the plaintiffs to assist in, or not to interfere with, obtaining a signal at Section Street, but it does not establish that the City did not so agree.

The City also asserts that actual development of the Property was a condition precedent to any contractual duty it had. (Doc. 157 at 19-20). If the City's only duty

---

(Davis Deposition at 79-82, 85-86). He was not asked specifically about signalization, so it is not clear that his testimony actually supports the City's position.

were the actual installation of the traffic signal, it might have an argument.  As discussed above, however, the evidence can be read to impose on the City a duty to assist in obtaining ALDOT approval for a signal and/or not to interfere with such efforts, and the City offers no support for the unlikely proposition that it was free to sabotage the signal so long as it did so before the plaintiffs broke ground.

Finally, the City notes that the plaintiffs were aware, before dismissing the Lawsuit, that a signal on Highway 98 at Parker Road and traffic improvements related to Highway 104 were already being considered, so they should have known that "timely development of Village North was critical to obtaining a signal at this location."  (Doc. 157 at 20).  The City does not explain how such awareness could negate breach of a contractual duty to assist in, or refrain from interfering with, obtaining a signal.

The Court does not definitively construe the parties' agreement but concludes only that, on the evidence and argument presented,[15] the City has not met its burden of showing that the plaintiffs' claim is precluded as a matter of law and uncontroverted fact. The Court has and expresses no opinion whether this claim would survive a properly supported motion for judgment as a matter of law.[16]

## II.  Equal Protection.

The amended complaint alleges that the City violated the plaintiff's state and federal equal protection rights by approving the Fly Creek Village PUD and deciding to alter the flow of traffic around the Property.  (Doc. 47 at 21).  The complaint identifies

---

[15] By way of example, the parties omit any discussion of the rules governing the determination whether a contract is ambiguous, how to resolve ambiguity, and the respective roles of judge and jury.

[16] The parties' discussion centers entirely on the signalization of Section Street.  The Court therefore does not address the other aspects of the plaintiffs' claim.  (Doc. 47 at 18-19).  In addition, because the claim survives summary judgment in any event, it is unnecessary to consider the plaintiffs' argument that the claim survives based on breach of the duty of good faith and fair dealing.

the following particulars as to which Corte was treated more favorably than the plaintiffs: (1) Corte was allowed a single-tenant square footage of 54,000, the plaintiffs only 18,000; (2) Corte's anchor tenant could be any type of establishment, the plaintiffs' only a grocery store; (3) Corte could use any ratio of retail to commercial space, but the plaintiffs were subject to a specific ratio; (4) Fly Creek Village was approved in contravention of the Plan in that it placed a village center within another village center's service area, while Village North was not; (5) Corte was allowed to place commercial development fronting Highway 98, while the plaintiffs were precluded from doing so; (6) Corte was allowed to incorporate a traditional retail strip center, but the plaintiffs were not; and (7) the City undertook to improve traffic flow around Fly Creek Village while adversely affecting traffic flow around Village North.  (*Id*. at 21-22).

The Equal Protection Clause does not constitute the federal courts "a zoning board of appeals." *Haves v. City of Miami*, 52 F.3d 918, 924 (11th Cir. 1995).  When, as here, there is no allegation that a suspect classification or fundamental right is in play, "zoning ordinances should be tested under the 'rational-basis' standard." *Id*. at 921.  "The rational-basis standard requires that classifications made by the challenged statutes or ordinances be rationally related to the achievement of some legitimate government purpose." *Id*.  The standard is purposefully forgiving so as to "provid[e] the political branches the flexibility to address problems incrementally and to engage in the delicate line-drawing process of legislation without undue interference from the judicial branch." *Id*. at 923-24.

Under this standard, the first step is "identifying a legitimate government purpose – a goal – which the enacting government body *could* have been pursuing." *Haves*, 52 F.3d at 921(emphasis in original).  What purpose the defendant actually was pursuing is legally irrelevant. *Id*.; *accord id*. at 923 (even a retaliatory purpose is irrelevant).  It follows that the defendant need not "articulate any reason for [its] actions" or make "any record of a legitimate purpose." *Id*. at 922.  Thus, "[a]s long as the City can present at least one plausible, arguably legitimate purpose for the [distinction], summary judgment

for the City is appropriate unless the [plaintiffs] can demonstrate that the legislature could not possibly have relied on that purpose." *Id*. at 923.

The second and final step "asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose." *Haves*, 52 F.3d at 922. As with purpose, it is irrelevant "whether that [rational] basis was actually considered by the legislative body." *Id*. (internal quotes omitted). Also as with purpose, "courts are not confined to the record when determining whether a rational basis for the classification exists." *Id*.

The City accepts that it has the initial burden to articulate one or more plausible, arguably legitimate purposes for its challenged decisions. (Doc. 169 at 13). Once it has done so, in order to avoid summary judgment the plaintiffs "have the burden to negative every conceivable basis which might support" the rationality of the classification. *Haves*, 52 F.3d at 922 (internal quotes omitted). The plaintiffs mount no serious effort to meet this daunting challenge, and it is plain they cannot succeed.

Prior to its rezoning as a PUD, 53 acres of Corte property bordering Highway 98 and Parker Road was zoned B-2, which allowed for extensive, heavy commercial development throughout the parcel. The City asserts that approving the Fly Creek Village PUD furthered the legitimate government purpose of limiting concentrated commercial development. (Doc. 157 at 24). The plaintiffs do not deny that this is a legitimate purpose, but they insist that "history subverts the City's argument" because the Corte property was never developed at all until receiving a PUD designation. (Doc. 165 at 45). The argument is misguided both factually and legally.

Legally, it is not clear how this is an equal protection challenge at all, since both the plaintiffs and Corte received PUD approval. At any rate, it is legally irrelevant whether approving the Fly Creek Village PUD in fact furthered the admittedly legitimate purpose of controlling commercial development. "It is not the Court's function to determine whether the City's decision might ultimately prove to be, in some sense, 'wrong,' because even if these rationales [relied upon by the City] are based on faulty

[15]

premises, the fact that they are arguable guides our decision in this case." *Haves*, 52 F.3d at 923 (internal quotes omitted). As discussed below, the City's rationale is far more than merely arguable.[17]

Factually, the Fly Creek Village PUD limited commercial development to 12 of the 53 acres; it further limited commercial development within this area to 108,000 square feet, or less than 2.5 acres under roof. It is nonsense to suggest that 53 acres of federal highway frontage in a growing city would have remained perpetually undeveloped absent a PUD, and the rezoning plainly reined in the development that certainly would have occurred eventually; that development may have appeared sooner under a PUD designation than it would have with B-2 zoning is beside the point. Granting the property PUD status patently furthered a legitimate government purpose.[18]

The City needs only one supportable reason for its decision to approve the Fly Creek Village PUD in order to survive an equal protection challenge, but there is more. Through negotiations with Corte, the PUD approval resulted in City annexation of an adjacent 160-acre undeveloped parcel of Corte property, complementing a then-active annexation campaign in the area, and the PUD limited its usage to residential. (Doc. 157 at 24). The plaintiffs do not even suggest that the annexation angle fails to provide a rational basis for the decision to rezone the Corte property as a PUD.

───────────────────

[17] Because, as noted in text, actual motivations are immaterial, it is also legally irrelevant that "there is no reference to this after-the-fact justification in the Planning Commission staff report, and no reference to it in the minutes of either the Planning Commission or City Council meetings." (Doc. 165 at 47-48).

[18] The plaintiffs represent that "much of the 53 acres … was in wetland areas and could not be developed as B-2 or anything else." (Doc. 165 at 47). The deponents on whom they rely for this proposition actually testified that they do not know how much of the acreage constituted wetlands, so the plaintiffs are left with no evidence to support their position. At any rate, this is pointless quibbling, since not even the plaintiffs suggest that all but 12 or fewer acres was undevelopable wetlands. The PUD unquestionably reduced the potential commercial development of the property.

Instead, the plaintiffs object that they were "promised" the only village center in north Fairhope. (Doc. 165 at 44). As discussed in Part I.A, this assertion is without any factual foundation and is thus also without relevance.

The plaintiffs' equal protection argument does not address the allegation of the amended complaint that Fly Creek Village was approved in violation of the Plan, rendering the allegation irrelevant. At any rate, its only possible utility would be to show that the City, in view of the Plan, "could not possibly have relied on" its articulated purposes in approving Fly Creek Village PUD. The plaintiffs, however, have not attempted to show that acting in violation of the Plan would trigger this exception even were the Plan mandatory. Moreover, "[t]he Equal Protection Clause gives government decision-makers wide latitude when creating policy exemptions to an existing law," *Haves*, 52 F.3d at 922, and the plaintiffs respond with silence to the City's observation that the plaintiffs' prolonged failure to develop the Property after receiving PUD approval unsatisfactorily left Fairhope without a village center in its northern reaches.

The amended complaint complains of disparate terms governing the two PUDs, but each challenged term of the Fly Creek Village PUD is supported by the legitimate purposes set forth above. Corte controlled a potential 53-acre commercial development that the City justifiably did not want to see and also controlled a 160-acre parcel of adjacent county property the City justifiably coveted for residential expansion. The terms of a PUD are by definition negotiable, and Corte had substantially more bargaining power than the plaintiffs.[19] Permission for a 54,000-square-foot tenant, a non-grocery anchor tenant, a strip center aspect, commercial frontage on Highway 98, and no required ratio of retail to commercial space all were appropriate means of securing the benefits of restricted commercial development and increased residential area – especially since,

---

[19] The plaintiffs, thanks to the Litigation, had bargaining power of their own, but they started from a weaker position, since the Property had already been incorporated into Fairhope and, because it was already zoned low-density residential, it was not susceptible to commercial development absent a PUD.

except for the single-tenant square footage, all were advantages Corte already possessed by virtue of the B-2 zoning. The plaintiffs also ignore that commercial development in Fly Creek Village was limited to 108,000 square feet – only 60% of the 180,000 square feet permitted Village North, even though Fly Creek Village has 213 acres and Village North only 108. The plaintiffs' sole effort to "negative every conceivable [rational] basis which might support" the City's action is to recycle their previously rejected "history" argument, which fares no better the second time around.

Finally, the plaintiffs complain of disparate treatment concerning traffic flow, but the picture here is equally clear. The City says that legitimate purposes for installing a traffic light at Highway 98 and Parker Road but not at Highway 98 and Section Street include promoting public safety, alleviating congestion, retaining flexibility for future changes, and respecting the position of ALDOT, which holds ultimate authority on the placement of signals. (Doc. 157 at 27). Each of these is a patently legitimate purpose, and the plaintiffs do not assert otherwise. Nor do the plaintiffs claim that the traffic decisions are not rationally related to these legitimate purposes. (Doc. 165 at 43-47). Because the plaintiffs bear the burden, their silence is fatal, though it is not clear how they could have shouldered their burden even had they attempted to do so.[20]

The amended complaint alleges a violation of equal protection under state law. (Doc. 47 at 21). Because the City does not address this aspect of the equal protection claim, it survives summary judgment.[21]

### III. Due Process.

---

[20] The amended complaint does not specify whether it reaches traffic decisions other than signalization. Because the City's articulated reasons for these decisions are the same, and because the plaintiffs do not address them, any equal protection claim based on these decisions must also fail.

[21] The Court has previously noted that Alabama may have no equal protection analogue, (Doc. 34 at 9 & n.4), but the City makes no such argument on motion for summary judgment.

Although the amended complaint does not specify, the plaintiffs concede that their claim is limited to denial of substantive due process, not procedural. (Doc. 22 at 5-6). "Substantive due process challenges to zoning regulations are analyzed under the rational basis standard." *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1214 (11th Cir. 1995). The test is the same one used for equal protection claims. *Id*. (applying *Haves*). The failure of the plaintiffs' federal equal protection claim dooms their federal substantive due process claim as well.

The amended complaint alleges a denial of state as well as federal due process. (Doc. 47 at 24). A zoning decision may be challenged on due process grounds if it does not "bear some substantial relation to the public health, safety, morals or general welfare." *Pollard v. Unus Properties, LLC*, 902 So. 2d 18, 23-24 (Ala. 2004) (internal quotes omitted). If "the wisdom of the ordinance is fairly debatable," it must be upheld. *Id*. (internal quotes omitted). The City invokes *Pollard*, (Doc. 157 at 36-37), and the plaintiffs do not object. For all the reasons stated in Part II, both PUD ordinances and the related traffic decisions bear a substantial relation to the public health, safety and welfare, and their wisdom is fairly debatable. The plaintiffs offer no defense of this claim, which fails as a matter of law.

## IV. Inverse Condemnation.

The amended complaint alleges that the approval of the Fly Creek Village PUD and the alteration of traffic flow around the Property constituted an inverse condemnation under Section 235 of the Alabama Constitution and Section 18-1A-32 of the Alabama Code. (Doc. 47 at 26). The Court previously granted the City's motion to dismiss this claim to the extent based on Section 235, on the grounds the plaintiffs had not alleged the "physical intrusion or taking" that they conceded was a necessary element of such a claim. (Doc. 34 at 13-14, 18). The Court's order also dismissed Count Five and portions of Counts Two, Three and Seven. (*Id*. at 17-18).

[19]

The plaintiffs subsequently filed a motion for leave to amend the complaint "to allege that the City purposefully discriminated against them with respect to the City's rezoning decisions and that the City owes the Dyases a duty of care." (Doc. 36 at 1; *accord* Doc. 45 at 2). The plaintiffs identified the changes wrought by the proposed amended complaint as affecting only paragraphs 61 (in Count Two) and 75 (in Count Five). (Doc. 36 at 2-3). The Court granted the motion, noting that the amended complaint "would make two changes in an effort to resuscitate the equal protection and negligence claims against the defendant City dismissed by previous Court order." (Doc. 46 at 1). The plaintiffs did not inform the Court that their proposed 28-page amended complaint re-pleaded verbatim the inverse condemnation claim that had just been dismissed, and the Court did not sanction re-insertion of the claim by granting leave to file an amended complaint addressing the equal protection and negligence claims.

The Court ruled on the defendants' motion to dismiss before either defendant had filed a responsive pleading. The version of Rule 15(a) extant at the time preserved a party's right to amend as a matter of course "at any time before a responsive pleading is served." However, the Eleventh Circuit had "f[ou]nd it appropriate to adopt the rule that after a complaint is dismissed the right to amend under Rule 15(a) terminates; the plaintiff, however, may still move the court for leave to amend …." *Czeremcha v. International Association of Machinists and Aerospace Workers*, 724 F.2d 1552, 1556 (11th Cir. 1984). Although *Czeremcha* involved dismissal of an entire complaint, there is no apparent reason that a different rule should apply when discrete causes of action are dismissed. The *Czeremcha* Court noted that its rule was necessary to avoid "frustrating the desire for certainty in the termination of the litigation," *id*. (internal quotes omitted), and that goal would be equally damaged by allowing litigants to unilaterally resurrect claims that have been thoroughly considered and found legally insupportable. It would, among other untoward effects, enable a losing litigant to avoid the stringent standard

[20]

governing motions for reconsideration and obtain a fresh start with an identical claim.[22] Nor is the requirement of a motion for leave to amend in order to restate a claim onerous, and it is an approach routinely undertaken in this Court, including by these plaintiffs.

Of course, an amendment – either as of right or by motion – assumes an actual change to the allegations the Court previously held inadequate. The plaintiffs, however, did not amend their pleading of Count Four but simply repeated it verbatim. Even had they the power to amend as of right, their failure to alter the allegations of Count Four prevents their re-assertion of a Section 235 claim from constituting an amendment to the pleadings.

For all these reasons, and despite the language of the amended complaint, there is no inverse condemnation claim under Section 235 pending in this action. The plaintiffs'

_____

[22] A motion to reconsider may not be used as a vehicle to inject new arguments into the underlying motion, or to submit evidence previously available but not properly presented on the underlying motion. *Mays v. United States Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997). Nor may it be used to "relitigate old matters." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (internal quotes omitted). Instead, "[a] motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice." *Gibson v. Mattox*, 511 F. Supp. 2d 1182, 1185 (S.D. Ala. 2007) (internal quotes omitted). The same rule applies to both final orders and interlocutory, since allowing parties to withhold arguments and evidence until after losing is equally destructive of judicial economy and fairness in either context. *E.g., id.* (even pre-judgment, "in the interests of finality and conservation of scarce judicial resources, reconsideration of an order is an extraordinary remedy that is employed sparingly"). As the Court has stated in this very case: "Motions to reconsider serve a valuable but limited function. They do not exist to permit losing parties to prop up arguments previously made or to inject new ones, nor to provide evidence or authority previously omitted. They do not, in short, serve to relieve a party of the consequences of its original, limited presentation." *Dyas v. City of Fairhope*, 2009 WL 5062367 at *3 (S.D. Ala. 2009).

The plaintiffs here seek to do precisely what they could not do on motion to reconsider. In opposition to the City's motion to dismiss, the plaintiffs conceded that Section 235 requires a physical intrusion or taking but argued they were pursuing instead a "regulatory takings" theory under two cases not decided under Section 235. (Doc. 22 at 8-9). Now, the plaintiffs completely change tacks, insisting that Section 235 does not really require a physical intrusion or taking after all. (Doc. 165 at 49-51).

unsupported ipse dixit that they may resurrect this claim simply by "reassert[ing] the count in their Amended Complaint," (Doc. 165 at 49 n.29), is rejected as unsupported by law.

As noted, the amended complaint cites a statutory as well as a constitutional basis for the inverse condemnation claim. The plaintiffs, however, assert that their only state-law claim is under Section 235. (Doc. 165 at 48-49). This concession disposes of any separate claim the plaintiffs might have had under Section 18-1A-32. They suggest they have a claim under the Fifth Amendment, (*id.* at 48), but Count Four of the amended complaint patently does not invoke any federal right or remedy.[23]


**V. Negligence.**

The amended complaint alleges that the City "acted negligently, carelessly and unskillfully in its approval of the Fly Creek Village PUD and in its alteration of the traffic flow around the Property." (Doc. 47 at 26). The parties agree that the City can be liable only if and to the extent permitted by Section 11-47-190 of the Alabama Code. (Doc. 157 at 43; Doc. 165 at 52). That section provides in pertinent part as follows: "No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless said injury or wrong was done or suffered through the neglect, carelessness or unskillfulness of some agent, officer or employee of the municipality engaged in work therefor and while acting in the line of his duty …."

"[B]efore liability for negligence can be imposed upon a governmental entity, there must first be a breach of a legal duty owed by that entity[, and] the initial focus is upon the nature of the duty." *Hilliard v. City of Huntsville*, 585 So. 2d 889, 890 (Ala. 1991). With respect to approval of the Fly Creek Village PUD, the plaintiffs argue only that the City owed them a tort duty not to approve the PUD because it had "agreed" and

_____

[23] At any rate, the plaintiffs concede their non-existent Fifth Amendment claim is not viable for want of an actionable taking. (*Id.*).

"promised" that the plaintiffs would have a neighborhood village center without overlapping service areas with any other village center. (Doc. 165 at 52). As discussed in Part I.A, no such agreement existed, so neither did any duty by the City. Without a duty, the plaintiffs have no claim.

Similarly, the plaintiffs argue that the City owed them a tort duty not to alter traffic flow due to the parties' agreement. (Doc. 165 at 53-54). As discussed in Part I.B, the City has not shown the absence of such an agreement. Nor has the City argued that a contractual duty does not imply a tort duty. For present purposes, the Court thus assumes the City had a tort duty to the plaintiffs not to alter traffic flow around the Property.

The City insists that it merely made decisions about traffic flow and that liability under Section 11-47-190 cannot be based on decision-making. (Doc. 157 at 43). The Alabama Supreme Court has stated that, "[u]ntil the legislature chooses to expand the liability of municipalities to include damages for wrongful decision making, this court will continue to limit such liability to only those injuries caused by 'neglect, carelessness or unskillfulness.'" *Ott v. Everett*, 420 So. 2d 258, 260 (Ala. 1982). Viewed in isolation, *Ott* could be read as excluding all "decision making" from Section 11-47-190. *Ott*, however, involved the "quasi judicial" denial of a liquor license, *id.*, and the decision "emphasize[d] that regulation of the liquor traffic is subject to the intrinsic police power of the state, a broad and plenary power." *Id*. The City cites, and the Court has located, no case applying *Ott* in any other situation. The City has not attempted to show that its traffic decisions were quasi-judicial or that its power over street traffic is as broad and plenary as that over liquor traffic. Nor has the City explained why the Alabama courts would extend *Ott* to a situation in which the municipality, despite whatever power it might otherwise have, has agreed with a citizen to exercise that power in a particular way. On the record and argument presented, the Court cannot conclude that *Ott* precludes the City's liability for negligent alteration of traffic flow.

The City points out that the amended complaint identifies no agent or employee who was negligent. (Doc. 147 at 43). In brief, however, the plaintiffs cite evidence that

[23]

the City's public works director failed to review Ordinance 1163 and the traffic study (containing the alleged agreement on traffic flow), resulting in traffic decisions made in ignorance of the City's agreement. (Doc. 165 at 53-54). The City complains that the plaintiffs offer no authority that the director had a duty to review the ordinance and study or that she was negligent in failing to do so. (Doc. 169 at 17-18). As the movant, however, the City bears the initial burden of showing that the director had no duty or was not negligent, and it has not attempted to carry that burden.

The City notes that ALDOT reviewed Ordinance 1163 and the traffic study and that the City relied on ALDOT to determine the safest course with regard to signalization and traffic improvements. (Doc. 169 at 18). The evidence on which it relies shows only that ALDOT reviewed the traffic study, not the ordinance, and ALDOT could not have detected the agreement on signalization without reviewing both. Nor does the City explain how ALDOT's review of these documents could exonerate it from tort liability. Certainly ALDOT had no obvious incentive, or duty, to discover the City's agreements with its citizens and ensure that the City did not breach them.

Finally, the City argues that it has "substantive immunity" from any liability that would otherwise arise under Section 11-47-190. (Doc. 157 at 44-45). Even when tort principles would otherwise impose a duty, "[w]e believe [that] public policy considerations … override the general rule and prevent the imposition of a legal duty, the breach of which imposes liability, in those narrow areas of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart the City's legitimate efforts to provide such public service." *Rich v. City of Mobile*, 410 So. 2d 385, 387 (Ala. 1982). This rule applies "only in the context of those public service activities of governmental entities … so laden with the public interest, as to outweigh the incidental duty to individual citizens." *Id*. at 387-88. There is no clear dividing line, and the rule "evolve[s] through the judicial process of trial and review on a case by case basis." *Id*. at 387.

The City relies on two cases in which substantive immunity has been applied in the context of zoning decisions. *Payne v. Shelby County Commission*, 12 So. 3d 71 (Ala. Civ. App. 2008); *O'Neal Homes, Inc. v. City of Orange Beach*, 2008 WL 2163919 (S.D. Ala. 2008). Neither addressed decisions concerning traffic flow, and the City's only effort to extrapolate these cases to that context is to remark that traffic work "is by its very nature work for the greater good of the municipality and an exercise of the police power." (Doc. 157 at 45). This unadorned comment is insufficient to carry the City's burden, since the same could said of fire protection, yet substantive immunity does not extend to that context. *Ziegler v. City of Millbrook*, 514 So. 2d 1275, 1275-77 (Ala. 1987). Nor does it apply to the design and maintenance of drainage systems. *City of Mobile v. Jackson*, 474 So. 2d 644, 649 (Ala. 1985). *Jackson* is particularly interesting, because it denied substantive immunity on the grounds that "[w]e find that the liability for negligent design or maintenance of drainage systems is analogous to that involved in the construction and maintenance of streets, alleys or public ways … and, thus, that the city is not immune in this case." *Id*. This linkage suggests that substantive immunity does not extend to the traffic context. It is even less likely that immunity would apply when the City has entered a contract with a citizen for a particular traffic resolution.[24] The City's limited argument and authority does not support an extension of substantive immunity to this case.

### VI. Misrepresentation.

The amended complaint alleges that Kant represented to the plaintiffs "that the City would approve the Dyases' request for a 54,000 square foot box based on the premise that the City could not approve for one (Corte) what it would not approve for another." (Doc. 47 at 27). The City offers several arguments, but one is dispositive.

---

[24] *See generally City of Birmingham v. Business Realty Investment Co*., 722 So. 2d 747, 750 (Ala. 1998) (municipality can waive immunity under Section 11-47-190).

Because the plaintiffs allege a promise to act or not act in the future, they are required to show that, "at the time of the misrepresentation, the defendant had the intention not to perform the act promised." *Southland Bank v. A & A Drywall Supply Co.*, 21 So. 3d 1196, 1210 (Ala. 2008) (internal quotes omitted). Several of the plaintiffs admit they have no such evidence. (Doc. 157 at 46).

In opposition to summary judgment, the plaintiffs offer no contradictory testimony. Instead, they argue that Kant's intent not to perform is reflected in evidence that he understood, when he made his representations, that the City's traffic decisions would "discourage big box retail from the site" and "make it extremely difficult, if not impossible, for the Dyases to attract a big box grocery store." (Doc. 165 at 56-57). Nothing in this evidence, however, remotely suggests that Kant intended not to fulfill his promise that the City would approve a 54,000 square-foot big box; it shows, at most, his realization that no tenant was likely to be attracted to a big box on the site.

**VII. Conspiracy.**

The amended complaint alleges that Kant conspired with Corte "for the purpose of depriving the Dyases of their vested rights in the Village North PUD approved by the City in 2002." (Doc. 47 at 28). The amended complaint does not specify whether it is brought under state or federal law, but the plaintiffs previously limited this claim to the latter. (Doc. 2 at 14). On the strength of this representation, the Court dismissed the conspiracy claim to the extent based on Alabama law, (Doc. 34 at 17), and the plaintiffs have not sought to alter that ruling. In opposition to motion for summary judgment, the plaintiffs affirm that this claim is limited to a conspiracy to violate their constitutional rights. (Doc. 165 at 59).

"To sustain a conspiracy action under § 1983 … a plaintiff must show an underlying actual denial of [his] constitutional rights." *Hadley v. Gutierrez*, 526 F.3d 1324, 1332 (11th Cir. 2008) (internal quotes omitted). As discussed in Parts II and III, the

plaintiffs cannot establish a denial of their constitutional rights. Accordingly, their conspiracy claim fails as a matter of law.

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment is **granted** in its entirety with respect to Counts Three, Four, Six and Seven; is **granted** with respect to the Fly Creek Village aspect of Counts One and Five; and is **granted** with respect to the federal equal protection aspect of Count Two. Each of these claims is **dismissed with prejudice**. The motion for summary judgment is **denied** with respect to the traffic flow aspect of Counts One and Five and the state equal protection aspect of Count Two.

DONE and ORDERED this 14th day of December, 2010.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE